IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANTONIO M. JONES,

    Petitioner,

v.

TIMOTHY SHOOP, WARDEN,
CHILLICOTHE CORRECTIONAL INST.,

    Respondent.

CASE NO. 2:19-CV-1849
JUDGE GEORGE C. SMITH
Chief Magistrate Judge Elizabeth P. Deavers

## ORDER and
## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this *pro se* Petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner seeks release from confinement imposed pursuant to a state-court judgment in a criminal action. This case has been referred to the Undersigned pursuant to 28 U.S.C. § 636(b) and Columbus' General Order 14-1 regarding assignments and references to United States Magistrate Judges.

Petitioner has filed a Motion for Leave to Proceed *in forma pauperis*. Upon consideration, the Court finds the Motion is meritorious, and, therefore, it is **GRANTED.**

**WHEREUPON, IT IS ORDERED THAT** the Petitioner be allowed to prosecute this action without prepayment of fees or costs and that judicial officers who render services in this action shall do so as if the costs had been prepaid.

This matter is before the Court on its own motion under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 4"). Pursuant to Rule 4, the Court conducts a preliminary review to determine whether "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief . . ." If it does so

appear, the petition must be dismissed. *Id*. With this standard in mind, and for the reasons that follow, these are the circumstances here. The Undersigned therefore **RECOMMENDS** that this action be **DISMISSED**.

## I. FACTS AND PROCEDURAL HISTORY

According to the Petition, Petitioner challenges his September 15, 2014, convictions after a jury trial in the Franklin County Court of Common Pleas for two counts of murder. The trial court imposed a sentence of 33 years to life. The state appellate court summarized the facts and procedural history as follows:

> {¶ 2} By indictment filed May 2, 2013, plaintiff-appellee, State of Ohio, charged Jones with one count of murder, in violation of R.C. 2903.02, an unclassified felony, with an accompanying firearm specification and repeat violent offender specification; one count of felony murder, in violation of R.C. 2903.02, an unclassified felony, with an accompanying firearm specification and repeat violent offender specification; one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree felony, with an accompanying firearm specification; and one count of having a weapon while under disability, in violation of R.C. 2923.13, a third-degree felony, with an accompanying firearm specification. All the charges related to the shooting death of James Edward Lane on April 20, 2013. Jones entered a plea of not guilty to all charges.
>
> {¶ 3} Jones elected to waive his right to a jury trial for Count 4 of the indictment, having a weapon while under disability, and have a bench trial for that charge only. As to the other three charges contained in the indictment, a jury trial commenced June 23, 2014. Officer Trevor Wolfe of the Columbus Division of Police testified that on the night of April 20, 2013, he responded to a dispatch of a shooting to 764 St. Clair Avenue, the location of the Happy Family Bar. When he arrived, he saw Lane with an obvious gunshot wound lying on the ground near a food truck parked at the bar's patio, and Officer Wolfe called for a medic. Officer Wolfe secured the scene until the detectives arrived.
>
> {¶ 4} Darren Cunningham, who worked security for the Happy Family Bar, was working the night of the shooting. Though he did not witness the actual shooting, Cunningham testified that an hour prior to the shooting, Jones came into the bar wearing a New York Yankees jacket, was "very amped up," and did not want Cunningham to pat him down. (Tr. Vol.II, 54.) At that time, Cunningham said Jones did not have a weapon on him. Cunningham said that he kept a close eye on Jones while he was in the bar because Jones "kept running back and forth in and out of the door," and he did that "about five or six times consecutively in maybe a ten-

minute period ." (Tr. Vol.II, 55.) Cunningham said a man inside the bar kept telling Jones to "just calm down." (Tr. Vol.II, 56.) Cunningham described Jones' behavior while he was inside the bar as "very agitated." (Tr. Vol.II, 56.)

When Jones left the bar for the last time, Cunningham followed him outside, but he did not see Jones in the parking lot, so he assumed Jones had left for good. Approximately 20 minutes later, Cunningham saw a large crowd of people "stampede in the back door," so Cunningham went outside and saw Lane lying outside on the ground by the patio's back gate. (Tr. Vol.II, 56.)

{¶ 5} Vernice Hill, Jones' cousin, testified that she knew Lane as a friend of her mother's, and that she learned that Lane had been shot on April 21, 2013 because her mother told her. Hill said that approximately 24 hours after the shooting, Jones came to her house wearing a New York Yankees jacket, "sweating real bad," and told her that he "shot somebody" at the Happy Family Bar. (Tr. Vol .II, 92.) Jones did not tell Hill who he had shot, but he indicated he "had some problems with another man." (Tr. Vol.II, 94.) Hill testified that Jones did not say anything to her about anyone pointing a gun at him or threatening his life before the shooting. Jones told Hill he planned to go to Georiga "to get away from him doing the shooting." (Tr. Vol.II, 94.) While he was at her home, Jones placed a gun in a cabinet under Hill's kitchen sink. He also took off his New York Yankees jacket and placed it on the back of a chair. Jones asked Hill if he could take a shower at her house, and Hill agreed. When Jones was in the shower, Hill went over to her mother's house, and then she returned to her house where Jones was "starting to lay on the couch." (Tr. Vol.II, 99.) Around 7:00 in the morning, Hill went back to her mother's house where she called the police. Police came to Hill's house and arrested Jones. Following Jones' arrest, the police searched Hill's home and recovered the gun and the jacket.

{¶ 6} Christopher Lewis, who was operating a food truck outside of the Happy Family Bar on April 20, 2013, testified that prior to the shooting, he saw Jones wearing a New York Yankees jacket, and he saw him get a gun out of the trunk of a car and place it in his pants. Lewis said Jones then went through the patio gate and into the bar. A few minutes later, Lane came to Lewis' food truck and ordered some food. Lewis had just turned around to face Lane when he saw Jones with the gun and then heard "maybe five, six shots." (Tr. Vol.II, 121.) Lewis testified he did not hear any arguments or threats just prior to the shooting. Lewis hid behind his barbeque smoker for a brief time, then came out and saw Lane on the ground saying "I'm hit, I'm hit." (Tr. Vol.II, 124.) Lewis saw Jones run away from the parking lot after the shooting toward St. Clair Avenue. Lewis did not see anyone other than Jones with a gun and said no one else fired a gun that night. On cross-examination, Lewis said it was possible he was mistaken about how many shots he heard that night.

{¶ 7} Detective Lowell Titus of the Columbus Division of Police's assault squad testified he responded to the Happy Family Bar the night of the shooting because homicide detectives initially thought Lane had stabilized and would survive his

injuries. Detective Titus said he spoke with the owner of the Happy Family Bar in order to obtain the surveillance video of the inside of the bar, the patio, and the parking lot. Detective Titus testified he spoke with Hill, and based on the information Hill provided to him, Detective Titus filed a warrant for Jones' arrest. After reviewing the surveillance video from both inside and outside the bar, Detective Titus said he did not see anyone pull a gun on Jones. The state played the surveillance video of the parking lot and patio area in court for the jury to see. The video showed Jones walking toward a group of three people, then Jones walking away from the group. The video further showed that Jones was facing away from the direction he ultimately fired when he pulled the gun out, and he then turned back around with the gun before firing. Detective Titus could not tell from viewing the video how many times Jones fired his gun.

{¶ 8} During Detective Titus' testimony, the state played the audio recording of Detective Titus' interview with Jones following his arrest. Jones said during the interview that he had problems with a man at the Happy Family Bar. Jones said that 25 or 30 minutes before the incident occurred, the man pulled a gun on him. He said that he was outside when the man "jumped" him, so Jones reached for his gun and shot the man, though Jones said "the bullet wasn't meant for the dude" and that he hit the wrong guy. (Tr. Vol .III, 182.) Jones said he only fired his gun one time. Jones told Detective Titus that the man he had been aiming for took off running after Jones fired his weapon. Jones said he did not know who any of the men were that he argued with at the bar. Jones said he stashed his gun in the bushes while he was inside the bar, then retrieved it from the bushes when he needed it.

{¶ 9} Kenneth Gerston, M.D., a deputy coroner with the Franklin County Coroner's Office, testified that Lane died from a gunshot wound. The bullet entered Lane's body through his right arm and traveled into the right side of his chest. Mark Hardy, a forensic scientist with the Columbus Division of Police, testified that he analyzed the spent projectile recovered from Lane's body and that the spent projectile matched the gun police recovered from underneath Hill's sink.

{¶ 10} Jones testified in his own defense. Jones stated he had often been on the receiving end of violence, saying he had been shot 12 times, stabbed 3 times, and run over by a vehicle 1 time, resulting in many hospitalizations. Turning to the events of April 20, 2013, Jones testified that he was arguing with someone at the Happy Family Bar and that the man showed him a pistol. Because of his history of being a victim of violence, Jones said he did not want to leave after seeing the man's gun because he was "scared." (Tr. Vol.IV, 264.) Instead of leaving, Jones said he went outside and retrieved his own gun and "put it on [his] waistline." (Tr. Vol.IV, 265.) When he encountered the man again, Jones said the man told him "I'm going to kill you." (Tr. Vol.IV, 265.) Jones said he started to walk away but he saw the man reaching and he saw a "brown handle," so Jones grabbed his gun and fired a shot because he has "been going through a lot in [his] lifetime and [he] learned about turning [his] back." (Tr. Vol.IV, 265.) He said he "wasn't trying to hurt nobody," but that his "life was on the line," so he did "what [he] had to do." (Tr.

4

Vol.IV, 265.) Jones denied ever telling Hill he planned to get out of Columbus after the shooting. On cross-examination, Jones said he "hit the wrong guy" when he fired his gun. (Tr. Vol.IV, 292.)

{¶ 11} Following deliberations, the jury returned guilty verdicts for both murder counts and the tampering with evidence count, as well as the accompanying firearm specifications. The parties stipulated to Jones' prior convictions, and the trial court found Jones guilty of having a weapon while under disability and the repeat violent offender specifications.

Following a sentencing hearing on September 12, 2014, the trial court merged Count 2, felony murder, into Count 1, murder, and sentenced Jones to an aggregate sentence of 33 years to life. The trial court journalized Jones' convictions and sentence in a September 15, 2014 judgment entry. Jones timely appeals.

II. Assignment of Error

{¶ 12} Jones assigns the following error for our review:

The verdict is against the sufficiency and manifest weight of the evidence.

*State v. Jones*, 10th Dist. 14AP-796, 2015 WL 3766794, at *1-4 (Ohio Ct. App. June 11, 2015).

On June 11, 2015, the state appellate court affirmed the judgment of the trial court. *Id.* On October 28, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Jones*, 143 Ohio St.3d 1501 (Ohio 2015). Meanwhile,

> [o]n June 4, 2015, appellant filed a pro se petition to vacate or set aside his judgment of conviction pursuant to R.C. 2953.21. In the accompanying memorandum in support, appellant argued that his trial counsel was ineffective in: (1) failing to call potential witnesses of whom counsel was aware, (2) failing to request a jury instruction on the lesser-included offense of manslaughter or involuntary manslaughter, (3) failing to visit appellant in jail more than three times before trial, (4) requesting too many continuances, (5) failing to properly cross-examine a witness, and (6) failing to pursue a "two-gun" strategy. . . .
>
> {¶ 8} By entry filed February 10, 2016, the trial court denied appellant's petition to vacate or set aside his conviction. In its decision, the trial court found appellant's second, fourth, fifth, and sixth allegations of ineffective assistance of counsel were barred by res judicata and that, alternatively, appellant failed to present evidence indicating deficient performance and/or prejudice as to any of those claims. The trial court further held that appellant failed to support his petition with evidence demonstrating deficient performance and/or prejudice as to the first and third claims.

*State v. Jones*, 10th Dist. No. 16AP-128, 2017 WL 1157248, at *3 (Ohio Ct. App. March 28, 2017). On March 28, 2017, the appellate court affirmed the judgment of the trial court. *Id*. Petitioner did not file an appeal.

Petitioner unsuccessfully pursued various other state collateral actions. On July 28, 2015, he filed a delayed motion for a new trial. On August 16, 2016, the appellate court affirmed the trial court's denial of that motion as untimely. *State v. Jones*, No. 16AP-13, 2016 WL 4382660 (Ohio Ct. App. Aug. 16, 2018). Petitioner did not file an appeal.

> {¶ 4} On May 3, 2017, appellant filed a pro se motion for relief from judgment, pursuant to Civ. R. 60(B)(5), asserting fraud upon the court had been committed at trial. . . . On June 2, 2017, the trial court issued a judgment denying appellant's motion for relief from judgment. The trial court held Civ. R. 60(B) did not apply because appellant was collaterally challenging his criminal conviction and such collateral challenges were governed by R.C. 2953.21 and Crim. R. 35. The trial court treated appellant's motion as a petition for postconviction relief, pursuant to R.C. 2953.21, and concluded it was barred by the doctrine of res judicata and the prohibition on successive petitions for postconviction relief contained in R.C. 2953.23.

*State v. Jones*, 10th Dist. 2018 WL 565434, at *2 (Ohio Ct. App. Jan. 25, 2018). On January 25, 2018, the appellate court affirmed the judgment of the trial court. *Id*. On May 23, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Jones*, 152 Ohio St.3d 1482 (Ohio 2018). On September 26, 2017, Petitioner filed a second motion for leave to file a delayed motion for a new trial. On August 28, 2018, the appellate court affirmed the trial court's denial of that motion as untimely. *State v. Jones*, 10th Dist. No. 18AP-59, 2018 WL 4927855 (Ohio Ct. App. Aug. 28, 2018). On February 6, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Jones*, 154 Ohio St.3d 1501 (Ohio 2019). On May 15, 2018, Petitioner filed a motion to vacate and set aside judgment of conviction, and on June 26, 2018, he filed a motion to proceed to judgment pursuant to civil rule 12(C). *See State v. Jones*,

10th Dist. No. 18AP-578, 2019 WL 1311104, at *2 (Ohio Ct. App. March 21, 2019). On March 21, 2019, the appellate court affirmed the trial court's denial of those motions as a successive post conviction action.[1] *Id.*

On May 5, 2019, Petitioner executed this habeas corpus Petition. (ECF No. 1, PAGEID # 23.) He asserts, as his sole ground for relief, that his convictions on two counts of murder of one victim violate the Double Jeopardy Clause. (PAGEID # 13.) However, in view of the foregoing procedural history, this action plainly is time-barred.

## II. STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996, imposes a one-year statute of limitations on the filing of habeas corpus petitions. 28 U.S.C. § 2244(d). The statute provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[1] Petitioner indicates that he has a motion for reconsideration still pending in the state courts on a post conviction action challenging his sentence as unconstitutionally imposed. (*Petition*, ECF No. 1-2, PAGEID # 20, 23.)

> (2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id*.

A District Court is permitted, but not obligated, to *sua sponte* address the timeliness of a federal habeas corpus petition, *Day v. McDonough*, 547 U.S. 198 (2006), and may do so when conducting an initial review under Rule 4. *See Wogenstahl v. Charlotte*, No. 1:17-cv-298, 2017 WL 3053645, at *2 (S.D. Ohio July 19, 2017) (citing *McDonough*, 547 U.S. at 198).

Here, the statute of limitations began to run on May 12, 2017, forty-five days after the appellate court's March 28, 2017, decision affirming the trial court's denial of Petitioner's first petition for post conviction relief, when the time period expired to file a timely appeal to the Ohio Supreme Court. *See Harper v. Warden*, No. 2:14-cv-01220, 2015 WL 3867262, at *8 (S.D. Ohio June 23, 2015) (citing *Campbell v. Warden*, No. 1:08-cv-311, 2009 WL 6594326, at *6 n. 4 (S.D. Ohio July 14, 2009) (footnote omitted). The statute of limitations began to run the following day, and expired one year later, in May 2018. Petitioner waited approximately one year, until May 5, 2019, to execute this habeas corpus Petition.

Moreover, none of Petitioner's subsequent state court actions tolled the running of the statute of limitations under the provision of § 2244(d)(2), because the state appellate court denied them as untimely under Ohio law, or he filed them after the one-year statute of limitations had already expired. "The tolling provision does not . . . 'revive' the limitations period (*i.e*., restart the clock at zero); it can only serve to pause a clock that has not yet fully run." *Vroman v. Brigano*, 346 F.3d 598, 601 (6th Cir. 2003) (citing *Rashid v. Khulmann*, 991 F. Supp. 254, 259 (S.D.N.Y. 1998)). Further, "[a] post-conviction petition that is rejected as untimely by the state courts is not "properly filed" within the meaning of § 2244(d)(2) and does not toll the running of

8

the statute of limitations." *Burns v. Warden*, No. 2:18-cv-00055, 2018 WL 684647, at *2 (S.D. Ohio Feb. 1, 2018) (quoting *Henderson v. Bunting*, 698 F. App'x 244, 246-47 (6th Cir. 2017) (citing *Allen v. Siebert*, 552 U.S. 3, 7 (2007)). A delayed motion for a new trial denied as untimely does not toll the running of the statute of limitations under the provision of § 2244(d)(2). *Anderson v. Warden*, No. 5:09-cv-0671, 2010 WL 1387504, at *3 (N.D. Ohio March 9, 2010); *see also Briscoe v. Eppinger*, 2017 WL 9476850, at *7 (N.D. Ohio Oct. 30, 2017) (citing *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)). Similarly, Petitioner's successive post conviction petitions do not toll the running of the statute of limitations. *See Payne v. Moore*, No. 5:15-cv-821, 2016 WL 703721, at *4-5 (N.D. Ohio Jan. 22, 2016) (citing *Pace v. DiGuglielmo*, 433 U.S. 408, 417 (2005); *Williams v. Birkett*, 670 F.3d 729 (6th Cir. 2012)).

Additionally, Petitioner does not allege, and the record does not reflect, any extraordinary circumstances that would justify equitable tolling of the statute of limitations. *See Holland v. Florida*, 560 U.S. 631, 649 (2010) (holding that in order to obtain equitable tolling of the statute of limitations, a litigant must establish that he has diligently pursued relief and that some extraordinary circumstance stood in his way of timely filing) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

## III. RECOMMENDED DISPOSITION

For the foregoing reasons, the Undersigned **RECOMMENDS** that this action be **DISMISSED.**

Petitioner's request for a stay of proceedings pending exhaustion of his claims (ECF 1-2, PAGEID # 23) is **DENIED**, as moot.

9

**<u>Procedure on Objections</u>**

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED**.

                                            _s/ *Elizabeth A. Preston Deavers*
                                             Elizabeth A. Preston Deavers
                                             Chief United States Magistrate Jud